Whitaker, Judge,
dissenting:
I dissent for the reasons given in the dissenting opinion in General Motors Corp., v. United States, 128 C. Cls. 465.
The opinion in this case was vacated by order of the court on March 6,1957, but the order left undisturbed the findings of fact which had been adopted in the opinion. The order and the findings of fact are as follows:
This case comes before the court on defendant’s motion for relief from a stipulation for judgment filed December 26, 1956, which stipulation was filed pursuant to the opinion rendered in this case on November 7,1956.
Defendant has so moved in view of the court’s opinion of January 16, 1957, in General Motors Corporation, Frigidaire Division v. United States, No. 55-56, taking the position that under this later opinion the plaintiff here is entitled to recover the sum of $80,994.79 rather than the sum of $130,190.22 as previously stipulated. In its reply filed February 6,1957, plaintiff agrees that the amount of $80,994.79 is now due it in this case.
Now, thereeore, it is ordered this sixth day of March, 1957, that defendant’s motion for relief from the stipu *894 lation filed December 26, 1956, be and the same is granted.
It is further ordered that judgment be and the same is entered for plaintiff in the sum of eighty thousand nine hundred ninety-four dollars and seventy-nine cents ($80,994.79), together with interest thereon as provided bylaw, and
It is further ordered that the opinion rendered in this case on November 7, 1956, be and the same is vacated and withdrawn, and the judgment this day entered in the amount of $80,994.79 is done so pursuant to the opinion of January 16, 1957, in Case No. 55-56, and the findings of fact heretofore entered on November 7,1956, in this case.
By the co,urt.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Bich-ard H. Akers, makes findings of fact as follows:
1. The plaintiff, General Motors Corporation, at all times material to this cause of action, was and is a domestic corporation organized and existing by virtue of the laws of the State of Delaware with its principal place of business in the City of Detroit, Michigan.
2. The Frigidaire Division has at all relevant times been a division or branch of the plaintiff with its principal office at Dayton, Ohio.
3. The principal business of the Frigidaire Division is the manufacture and sale of electrical appliances. During the period of the claim in this action, January 1, 1942 through December 31, 1944, it sold the following products manufactured by it: household refrigerators, electric ranges, electric water heaters, compressors or coils for commercial refrigeration, water coolers and water cooler tanks, beverage coolers, ice cream cabinets, milk cooler units, air conditioning equipment, store and room coolers, evaporating condensers and duct units, cooling units for soft drink equipment, mobile refrigeration and air conditioning equipment units, sealed units for replacements in refrigerators, water coolers, beverage coolers, ice cream cabinets and self-contained air conditioners, and service parts and accessories.
*895 4. During the period of the claim in this action, certain of the articles manufactured and sold by the plaintiff were subject to the manufacturer’s excise tax imposed by Section 3405 of the Internal Eevenue Code of 1939. The plaintiff filed timely returns and paid manufacturer’s excise taxes upon its sales prices of such articles in the amount of $2,103,345.47.
5. The Commissioner of Internal Eevenue (hereinafter sometimes referred to as the “Commissioner”) has assessed and the plaintiff has paid additional manufacturer’s excise taxes for the period of January 1, 1942, through December 31, 1944, in the amount of $74,625.63, plus interest in the amount of $6,369.16. Payments of the above amounts were made to the Collector of Internal Eevenue at Cincinnati, Ohio, on the dates and in the amounts as follows:

The basis for such additional taxes was the inclusion by the Commissioner as a part of the selling price of the various appliances of an amount received by the plaintiff on account of a Protection Plan (hereinafter more particularly described both as to its nature and to its relationship to the selling price) on various products subject to the manufacturer’s excise tax, including household refrigerators, water coolers, ice cream cabinets, beverage coolers and air conditioners and on replacement units for certain of such products. The amount received by the plaintiff from this source in the period here involved and on which the additional tax was computed aggregated $820,882.00, of which $74,625.63 was treated and assessed by the Commissioner as manufacturer’s excise tax thereon.
6.On July 25, 1946, the plaintiff duly filed, pursuant to the applicable law and regulations, a claim for refund with respect to the additional taxes and interest described in finding 5, in the total amount of $80,994.79. The claim for refund read in part as follows:
*896 Claim is hereby made for the refund of said $74,625.63 and interest of $6,369.16 plus interest as provided by law on both said amounts from the respective dates of payment.
The taxpayer claims that said tax and interest has been erroneously and illegally assessed and collected because the charge made by the taxpayer in respect of the additional four year warranty contract under which it sold its refrigerators, refrigerating apparatus and air conditioners during the periods in question was not subject to the tax imposed by Section 3405 of the Internal Revenue Code as amended.
If the Commissioner takes the position that the warranty charge was an item or element in the price of the refrigerators, refrigerating apparatus and air conditioners as the basis for excise tax, then in the alternative taxpayer claims that said taxes and interest have been erroneously and illegally assessed and collected at least to the extent of the value of the four year warranty service.
7. On January 7,1948, the Commissioner by letter sent by registered mail rendered a decision rejecting and disallowing the claim for refund referred to in finding 6.
8. The plaintiff has not included any excise tax on the amount received by it for the Protection Plan, either as a charge for the plan or as part of the price of the products covered by such plan, and has not collected the amount of any such tax from the purchasers of its products. However, the Commissioner collected taxes on the amount received for the Protection Plan at the rate of 1/llth thereof, the rate of tax at the time being 10 per cent.
9. The practice by a manufacturer of warranting his product has often been followed. The period of such warranty has varied depending upon the nature of the product and the use to which it is normally put. In the refrigeration industry, by the later 1920’s, one year had come to be recognized and observed by most manufacturers as the appropriate period of that warranty. The plaintiff adopted the One-Year Warranty for its products about the middle of the 1920’s and has continued that warranty until the present time. Under this warranty the plaintiff undertakes to repair or replace any part or parts of the product found to be defective “within one year from the date of delivery ... to *897 the original purchaser.” The original purchaser (sometimes otherwise referred to herein as “ultimate consumer” or “original user”) referred to in the agreement is the first purchaser who becomes a user of the product; for example, the first householder who purchases the appliance from a dealer and has it installed in the home. No separate charge has ever been made by the plaintiff for this warranty and at all times an amount calculated to cover the probable expense thereunder has been set up as a reserve, which has been taken into consideration in determining the price of the manufactured article. The plaintiff’s method of calculating this reserve has varied. Originally a fixed figure of $1 or $2 was allowed but in more recent years a percentage of manufacturing cost has been set aside to cover probable expenses under the One-Year Warranty.
10. Performance under the One-Year Warranty was and is carried out under a joint arrangement between the plaintiff, as the manufacturer, its distributor, and the dealer who sells the product to the original user. The plaintiff supplies the necessary material through its distributor and the plaintiff absorbs the transportation expenses in connection with such material, while the dealer is responsible for other labor and installation charges.
11. The reserve established by the plaintiff for the One-Year Warranty is charged with all expenses incurred by the plaintiff in performing the One-Year Warranty obligation and is closed out directly as an item of profit or loss on current operations.
12. During the period January 1,1942, through December 31, 1944, the plaintiff continued to give the standard manufacturer’s warranty of one year on its products. Unlike the charge for the Protection Plan warranty (hereinafter more particularly described), the charge for this One-Year Warranty was not separately billed and accounted for but was computed into the sales price of the products which was used as the basis for the excise tax paid by the plaintiff. In other words, the anticipated expenses for fulfilling the plaintiff’s One-Year Warranties were not separately charged to the purchasers of the plaintiff’s products but were taken into *898 consideration by the plaintiff as expense items in fixing the prices of its products.
13. Until 1933 independent dealers and, in some cases, distributors, who sold the plaintiff’s products but were otherwise unaffiliated with the plaintiff, performed the bulk of the repair service required upon products manufactured by the plaintiff following the expiration of the manufacturer’s One-Year Warranty.
14. In 1933 the plaintiff became dissatisfied with the quality and cost of the service rendered by numerous of its dealers and distributors and determined to expand its own facilities and enlarge the scope of its own repair operations with the objective of providing for all the users of its products a high quality and low priced service. Since the late 1920’s the plaintiff had provided some repair services at Dayton but had confined itself principally to selling service parts to dealers and others.
15. To carry out the objective described in finding 14, the plaintiff commenced to sell optional “Frigidaire Service Agreements” on its products in the latter part of 1933. Similar agreements, sometimes called repair or maintenance agreements, had theretofore been widely used by dealers and distributors in the servicing of refrigeration products, and the plaintiff had encouraged the sale and use of such agreements.
16. Under the Frigidaire Service Agreement which it sold from late 1933 through 1935, the plaintiff agreed to repair, adjust and maintain, as necessary, the mechanical refrigerating unit on any product with respect to which the agreement was purchased. The agreement was sold to cover a period of one, two or three years following the expiration of the manufacturer’s One-Year Warranty, at a cost of $6 per year, and its purchase was optional with all purchasers of products manufactured by the plaintiff.
17. To enable it better to perform repair services under the Frigidaire Service Agreement it sold, the plaintiff established repair service stations in Newark, New Jersey; Kansas City, Missouri; and Oakland, California; in addition to the shop already in operation in Dayton, Ohio.
*899 18. In 1935 the plaintiff introduced and began to sell another type of service or maintenance agreement called a “Four-Year Eeplacement Contract.” The plaintiff limited this agreement to the rotary type of mechanical refrigerating unit which powered certain of the products sold by it. Under this agreement the plaintiff undertook to replace such unit in the event it became inoperative within four years following the expiration of the manufacturer’s One-Year Warranty. The cost of the agreement was $10 and its purchase was optional with the purchaser of products manufactured by the plaintiff.
19. No manufacturer’s excise tax was assessed or collected by the Commissioner on the amounts received by the plaintiff from the sale of Frigidaire Service Agreements and Four-Year Eeplacement Contracts in 1933, 1934, and 1935, by reason of their optional character, although the products which they covered were subject to such tax.
20. In 1936, for reasons hereinafter set forth (see findings 31, 32), the plaintiff discontinued the sale of both the Frigidaire Service Agreement and the Four-Year Eeplacement Contract and instituted the Protection Plan. The Protection Plan, like the Four-Year Eeplacement Contract, is an agreement by the plaintiff to repair or replace the refrigerating unit (or, in plaintiff’s parlance, the “sealed unit”) in one of plaintiff’s products if the unit becomes inoperative within a prescribed period (as further explained in findings 23 and 24).
21. The charge made by the plaintiff for the Protection Plan was $5 with respect to all products and models thereof on which the Protection Plan was sold during the period January 1,1942, through December 31,1944, except that for self-contained air conditioners the charge varied from $7.50 to $90 depending upon the size and type of the product.
22. The physical activities of the plaintiff and others acting under its direction in discharging the plaintiff’s obligations under the Protection Plan related exclusively to the re-operation of the refrigerating unit.
The amounts received by the plaintiff by reason of the Protection Plan were to cover services and obligations to which the plaintiff committed itself under the plan and to cover *900 estimated expenses which would result in fulfilling these commitments. Neither the amount which the purchaser of a product was required to pay on account of the Protection Plan nor the expenses which the plaintiff expected to incur in performing its obligations under the Protection Plan entered into the unit prices (see finding 37) which the plaintiff otherwise charged for its products in 1936 when the Protection Plan was instituted or at any time thereafter.
23. As to new products (as distinguished from replacement units; see finding 24) sold by the plaintiff under the Protection Plan, the plaintiff’s obligations and performance under the plan commenced one year after delivery of the protected product to the first user thereof (i. e., immediately upon the expiration of the One-Year Warranty) and continued for a period of four years thereafter.
24. In addition to sales of the Protection Plan on new products plaintiff also sold the plan in connection with sealed units which are inserted as replacements for inoperative units in products as to which no warranty (either the One-Year Warranty or the Protection Plan) was then in effect. When a sealed unit in such a product (described by the plaintiff as a product which was “Out-of-Warranty”) failed, the user could turn in (or “exchange”) the defective unit and purchase from the plaintiff both a replacement sealed unit and the Protection Plan thereon, in which case the plaintiff’s obligations and performance under the plan commenced immediately upon the installation of the replacement unit and continued for a period of four years thereafter.
The One-Year Warranty on new products did not apply to such replacement units; where a user turned in a defective unit from an out-of-warranty product and purchased a replacement unit without the Protection Plan, he received only a 30-day warranty on that replacement unit.
25. The agreement under both the One-Year Warranty and the Protection Plan constituted an obligation of the plaintiff to the ultimate consumer. The agreements were for the benefit of the user of the product protected.
26. Although the One-Year Warranty on new products covered the entire product (including the sealed unit) for one year after delivery, and the Protection Plan on new *901 products covered the sealed unit for four years after tlie expiration of the One-Year Warranty, the plaintiff’s sales department urged that when the terms of the two agreements were put in writing, they be phrased in such a way as to show separately (1) the total period of coverage on the sealed unit (five years) and (2) the coverage of all other parts of the product (one year). Accordingly, in order to make the agreements as simple and as clear to the user as possible, they were incorporated in a single certificate captioned “Frigidaire 5-Year Protection Plan” and read as follows:
We warrant this Frigidaire refrigerator to be free from defects in material and workmanship under normal use and service.
5-Year Warranty on Sealed in Mechanical Unit— At any time within five years from the date of delivery to the original purchaser, we will repair or replace without cost to the owner or user the Sealed-in Mechanical Unit [consisting of the condenser, refrigerant control, freezer, Meter-Miser compressor unit, the tubing used to connect this equipment, and the Sealed Cold-Wall system, as shown in gold in the illustration at the right], or any part thereof, provided our examination shows that such apparatus is defective. This 5-Year Warranty applies only to the Sealed-in Mechanical Unit. All other parts of the refrigerator including temperature control and starting relay, are covered only by the 1-Year Warranty.
1-Year Warranty on Entire Refrigerator — At any time within one year from the date of delivery of this Frigidaire refrigerator to the original purchaser, we will repair or replace without cost to the owner or user any part or parts of the refrigerator, provided our examination shows such part or parts to be defective.
These warranties do not apply to light bulbs — or to any part of the Frigidaire refrigerator which has been subject to misuse, neglect, alteration, accident, or to damage caused by transportation after the original installation — or to any damage caused by flood, fire or acts of God. Service calls, other than those covered by conditions specified in these warranties as our responsibility will be made at the expense of the user. These warranties apply only to refrigerators installed in the United States and Canada.
*902 27. The certificate setting forth the plaintiff’s obligations under the Protection Plan and the One-Year Warranty was packed at the factory in an ice-cube tray of the refrigerators and in a similarly secure place inside other products. That certificate remained with the product until it reached the ultimate consumer. Upon installation of the product the installing dealer usually inserted on the certificate the cabinet and mechanical unit serial numbers and delivered the certificate to the ultimate consumer.
28. In 1936 when the Protection Plan was instituted, the plaintiff offered it on an optional basis with respect to 1935 models as yet unsold to the ultimate consumer. Out of a total of 12,000 products as to which the option to purchase the Protection Plan was thus extended, the option was exercised and the Protection Plan purchased with respect to approximately 7,000.
29. Whereas the Frigidaire Service Agreements of 1933-35 and the Four-Year Replacement Contracts of 1935-36 had been sold by the plaintiff at the option of purchasers of its products, since the institution of the Protection Plan in 1936 the plaintiff has required (except as described in finding 28) that the plan be purchased on every product to which it was applicable except that where the product was purchased by a “multiple unit purchaser” the plaintiff has not required the purchase of the Protection Plan. In such latter cases the plan has been made available at the option of the “multiple unit purchaser.” A “multiple unit purchaser” is a purchaser who buys large quantities of products manufactured by the plaintiff, such as a builder, an apartment house owner, or a national account. Regardless of whether the “multiple unit purchaser” purchased the Protection Plan, he received with each appliance purchased the standard manufacturer’s warranty of one year upon the entire product.
30. Subsequent to the inauguration of the Protection Plan in 1936, and prior to January 1,1942, approximately 100,000 household refrigerators were sold to multiple unit purchasers by the New York Branch of General Motors Sales Corporation, Frigidaire Division. All such purchasers were extended an option to buy the Protection Plan, but none were required to buy. The plan was purchased to cover approxi *903 mately 93,000 such units, and was rejected in 7 percent of the cases.
31. By the payment of the charge for the Protection Plan .(usually $5) any purchaser thereof became entitled to the four-year protection which it afforded. The plaintiff’s purpose in substituting the Protection Plan for the agreements previously offered on an optional basis and in requiring all purchasers except multiple unit purchasers to come under the Protection Plan was to make better repair service available to all users of its products at a reduced charge.
32. The plaintiff expected to increase substantially the number of participants in its service program over the number that had participated when the service agreements were offered on an optional basis. By thus broadening the coverage the plaintiff expected that it would be called upon to repair a smaller percentage of protected units than it had been required to repair under the optional plans previously sold by it.
The plaintiff also expected that the volume of repair business assured it through the increased number of participants would permit a substantial reduction in the unit cost of the services it was obliged to perform under the Protection Plan and had been obliged to perform under the service agreements sold in the three previous years.
33. The amount which each purchaser of a household refrigerator or other product has been required to pay for the Protection Plan since its institution in 1936 has been $5 (except as to self-contained air conditioners), a 50% reduction from the amount such purchasers were required to pay under the Four-Year Replacement Contract sold by the plaintiff on an optional basis in 1935. The amount purchasers were required to pay on account of the Protection Plan resulted from the plaintiff’s determination that the probable cost for the repair of a single unit would be approximately $25 and that not more than 20 percent of the units sold would become inoperative during the four-year period of the Protection Plan. On that basis it was determined that $5 from each purchaser of its products would meet the anticipated costs.
34. The plaintiff’s institution of the Protection Plan and its decision as to products to be covered and the extent to *904 which purchasers of its products should be required to pay the additional charge for the Protection Plan were not influenced by the imposition of the manufacturer’s excise tax. Since the inception of the Protection Plan the plaintiff has manufactured and sold water coolers, beverage coolers, ice cream cabinets, and replacement units which at various times have not been subject to the manufacturer’s excise tax but were nevertheless at all times subject to the plaintiff’s requirement for the payment of an additional charge for the Protection Plan. Likewise, since the inception of the Protection Plan, plaintiff has manufactured and sold three products which at various times have been subject to the excise tax-electric ranges, water heaters, and truck cooling units— as to which the One-Year Warranty but not the Protection Plan has been applicable.
35. During the entire period of the claim in this action, January 1,1942, through December 31,1944, the plaintiff in the regular course of business sold the products manufactured by it (listed in finding 3) directly to distributors and dealers, and infrequently to ultimate consumers. Plaintiff maintained from seven to nineteen branch offices which handled its products essentially as distributors. Distributors, of whom there were approximately twenty-five, sold in turn to independent dealers whose number varied between 8,000 and 8,500; directly to multiple unit purchasers; and occasionally to ultimate consumers. The great bulk of the sales of the plaintiff’s products to ultimate consumers was made by dealers who had previously purchased either from the plaintiff directly or from distributors who had purchased from the plaintiff.
During the period January 1,1942, through December 31, 1944, the plaintiff’s gross sales of products on which the excise tax was levied, exclusive of excise taxes paid and exclusive of Protection Plan collections, were $21,298,813.10.
36. The plaintiff (including its branches) as a regular practice on all invoices rendered throughout the period of the claim covered by this action billed the Protection Plan separately from the unit price of the products which the plan protected.
*905 37. The plaintiff as a regular practice throughout the period of the claim involved in this action issued price schedules to its distributors. Such schedules had two principal purposes: (first) to establish the unit prices at which the plaintiff would sell to the distributors products manufactured by it; and (second) to suggest for such products cash installed unit prices to the ultimate consumers after making due allowances for distributor and dealer mark-ups. These latter prices were suggested prices which might be made by the dealer or other party who sold to the ultimate consumers but the prices shown on the schedule to the distributor were firm figures at which sales between the plaintiff and the distributor were made so long as the price list remained effective. On the schedule, preceding the prices listed, appeared this notation:
(Following prices are exclusive of the $5.00 charge for the additional four-year warranty on the mechanical units as included in the Five-Year Protection Plan.)
Following the prices appeared this notation:
Note. — There will be added to the above prices on Household Cabinets with sealed-in mechanical units a charge of $5.00 for the four-year unit replacement included in the five-year protection plan on the sealed-in mechanical unit.
38. The plaintiff neither controlled nor directed the operations or practices of the independent distributors and dealers who sold the products manufactured by it. However, it did, as a regular practice, advise and consult with the independent distributors and, on occasion, with dealers on matters of common interest. So far as the Protection Plan was concerned, the plaintiff suggested and advised that it should be handled as an item independent from the product it protected.
39. The independent distributors who purchased from the plaintiff during the period of this claim, as a regular practice billed the charge for the Protection Plan as a separate item apart from the unit price of the product which the plan protected on all invoices rendered whether to dealers or ultimate customers.
40. The independent distributors, and the plaintiff’s branches, as a regular practice, issued price schedules to the *906 dealers to whom they sold. These schedules served the same purposes and were issued in a similar manner as those issued by the plaintiff as described in finding 37.
41. The practices of the independent dealers, who numbered between 8,000 and 8,500 during the period of this claim, were not uniform with respect to the manner in which the products on which the Protection Plan was sold were invoiced to their customers. Some itemized the amount for the Protection Plan separate from the price for the product, while others rendered a bill in a single amount which included both the price for the product and for the Protection Plan. The dealers generally made known to prospective customers by various means the general nature of the Protection Plan and the fact that included in the total amount paid was an amount (usually $5) on account of the Protection Plan.
42. In some instances the commissions paid to dealers’ salesmen who sold the plaintiff’s products to the ultimate consumer, and which products were subject to the Protection Plan, were based on the total amount paid at the time of the purchase, including the amount paid on account of the Protection Plan, whereas in other instances the commissions were based on the amount paid by the ultimate consumer at the time of the purchase,' exclusive of the amount paid on account of the Protection Plan.
43. The amount of $5 fixed for the Protection Plan, as heretofore described, has been re-examined by the plaintiff at regular intervals. The factors considered by the plaintiff in such re-examinations have been the acceptability of that amount to purchasers of the plaintiff’s products and services, the percentage of defectives that had been experienced in the past and might be expected in the future, and the costs of performing the services required under the Protection Plan.
44. Because of the plaintiff’s practice of changing its models annually, its experience as to rate of defectives on earlier models has provided merely an indication, not an accurate guide, as to future experience.
45. The plaintiff discharged its obligations under the Protection Plan by establishing and maintaining a cyclical flow of sealed units which operated essentially as follows: when *907 the plaintiff entered upon the manufacture of a particular model of a particular product, it manufactured more sealed units than cabinets, thus creating a “bank” of extra sealed units which were held in an inventory account and warehoused until such time as they were needed to replace units which became inoperative after delivery of the refrigerator to the user. The extra units were delivered, as needed, first to the plaintiff’s distributors and thence to dealers who installed them in refrigerators in which the original units had become inoperative. The inoperative unit, when removed from the refrigerator, was sent by the dealer to one of the plaintiff’s several repair shops (see finding 47) for repair. After the repair shop had reoperated the unit, renovating it as completely as possible, the unit was returned to the “bank” for future use as a replacement unit, thus completing the cycle. In thus fulfilling its obligations under the Protection Plan, the plaintiff’s usual practice, as just shown, was to replace a defective or inoperative unit with one obtained from its “bank” which was in operating condition rather than to repair and return to the same customer the unit which had been found inoperative. At no time, during the period here involved, did the plaintiff or its distributors or dealers, in the fulfillment of the plaintiff’s obligations under the Protection Plan, make any refunds or credits to the ultimate consumer-purchaser of the products involved in this action on account of defective or inoperative units.
46. The sealed units that were installed and replaced as described in finding 45 and repaired in the plaintiff’s repair shops (as hereinafter described) included all sealed units which the plaintiff had undertaken to replace and repair, including units replaced under the One-Year Warranty, units replaced under the Protection Plan, and units replaced on an out-of-warranty “exchange” basis as described in finding 24.
47. During the period January 1,1942, through December 31,1948 (the period within which the bulk of the Protection Plans sold between January 1,1942, and December 31,1944, were in effect), the actual repairing of defective sealed units was conducted in shops devoted exclusively to such operations. The shops were located as follows: New York City, New York; Atlanta, Georgia; Kansas City, Missouri; and *908 Oakland, California. In addition to these so-called “zone shops”, the plaintiff in the same period maintained a similar repair shop at one of its main centers of activity in Moraine City, Ohio. Although the Moraine City repair shop was physically located in the same building with other operations conducted by plaintiff, the shop and its personnel and equipment, as in the case of the zone shops, were exclusively engaged in the repairing of sealed units.
48. When a dealer determined that the sealed unit in a product manufactured by the plaintiff and owned by a user (entitled to service thereon) had become inoperative, the dealer would send to his distributor (or a branch of the plaintiff) an order for a replacement unit, furnishing on a standard form detailed information as to the product and the inoperative unit involved (including the identifying unit serial number). He would also indicate on the form whether the unit was to be replaced under the One-Year Warranty, under the Protection Plan, or upon an Out-of-Warranty “exchange” basis.
49. The distributor or branch, having purchased (and been charged by the plaintiff for) a number of crated sealed units from the “bank” (see finding 45) in anticipation of such dealer orders, would ship and charge an appropriate crated unit to the dealer, simultaneously giving the plaintiff’s offices in Dayton, Ohio, and either the Moraine City repair shop or the zone shop nearest the particular dealer full information (on a standard form) as to the products, the unit, and the warranty classification (One-Year Warranty, Protection Plan, or Out-of-Warranty).
50. Upon receipt of the crated replacement unit, the dealer would remove the inoperative unit from the cabinet in the user’s home, unpack and install the replacement unit, pack the inoperative unit in the crate in which the replacement unit had been received, and ship the crated inoperative unit to the repair shop for repair, using shipping documents furnished with the crate by the distributor or branch.
51. Upon receipt of the inoperative unit, the repair shop would make the necessary repairs, recrate the unit and store it in the “bank” warehouse until ordered by a distributor or branch for re-use as a replacement unit.
*909 52. As each inoperative unit was received at a repair shop, the plaintiff gave the distributor (or branch) who supplied the replacement unit to the dealer credit for the returned unit. The returned unit was then placed in inventory and the plaintiff’s “bank” inventory was thus brought back to its original level. Upon receipt of credit from the plaintiff, the distributor (or branch) gave a corresponding credit to the dealer who installed the replacement unit. In this cycle of transactions (plaintiff to distributor to dealer to plaintiff) every distributor and dealer charged for a sealed unit subsequently received an offsetting credit upon receipt by the plaintiff of the inoperative unit replaced; hence no such distributor or dealer was ever obliged to pay for a sealed unit used in the repair-and-replacement cycle.
53. Although the plaintiff’s zone shops were equipped to handle the majority of the repair problems encountered in the reoperation of sealed units, one operation — that of re-operating the so-called “compressor” of the sealed unit — was performed only at the repair shop located at Moraine City, Ohio.-
54. During the period here involved the only products protected under the Protection Plan which were not processed and reoperated as described in findings 45-53 were certain refrigerators which were manufactured by the plaintiff in small numbers in 1942 and which were powered not by the sealed unit refrigerating mechanism referred to above but by a reciprocating mechanism. Although the coverage of the One-Year Warranty and of the Protection Plan on such products was the same as that on sealed unit products in terms of the protection periods and the parts of the product covered, the plaintiff’s performance of its obligations thereunder with respect to the reciprocating units consisted not of replacing inoperative units but of having a dealer’s mechanic go to the user’s home with any necessary spare parts and tools needed to put the reciprocating unit back into operation without removing it from the user’s home. The expenses of fulfilling the plaintiff’s obligations under the Protection Plan with respect to these reciprocating units (which expenses consisted of (i) payments made to dealers to reimburse them for repair labor expense, and (ii) the *910 cost of spare parts) were kept by the plaintiff in a separate account. The amount of such expense for repairs which the plaintiff was required to make under Protection Plans sold during the period of this claim (January 1, 1942, through December 31, 1944) was $1,181.08.
55. The total expenses shown by the plaintiff’s books as representing its costs of fulfilling its obligations under Protection Plans sold during the period January 1,1942, through December 31, 1944 (including the amount of $1,181.08 described in finding 54), were $1,432,081.49, and were made up of the following major categories of expense:
Cash Payments to Distributors and Dealers- $243,299.05
Freight_ 105, 804.68
Unit Ke-operation (Less Compressor)_ 567,827.87
Compressor_ 372,558.89
Units Scrapped_ 5, 523.61
Tools and Equipment_ 17, 084. 51
Commercial Expense- 100, 003.74
Experimental_ 1„354.20
Obsolete and Unsalable Stock Scrapped_ 4,663.93
Miscellaneous_ 13,961.01
Total_ 1,432,081.49
56. There is set forth in the following subparagraphs a description of the types of expenses treated by the plaintiff as the costs of the sealed unit operation as a whole, and the amounts of such expenses (computed as hereinafter described in findings 60 and 62) attributable to the Protection Plan:
(a) Gash Payments to Distributors (including branches) and to Dealers ($213$99.05). Distributors and dealers were required to make out-of-pocket expenditures, in cash or in kind, in connection with the plaintiff’s repair and replacement programs, and for such of these expenditures as were made with respect to units handled under the Protection Plan, the plaintiff provided for reimbursement of the distributors and dealers involved by means of cash payments, sometimes referred to herein for convenience as “allowances.” These cash payments were (i) to reimburse the distributor for the clerical-administrative costs incurred by him in ordering replacement sealed units from the plaintiff, in warehousing and keeping accounting records of such units, in handling *911 shipping documents, and in generally doing the “paper work” required of the distributor by the plaintiff’s programs; (ii) to reimburse the dealer for similar “paper work” expense and for labor charges in handling replacement and inoperative sealed units as described in findings 48 and 50. All “allowances” described above were paid at fixed per-unit rates for each unit processed by the distributor or dealer receiving the “allowance,” and all were actual payments (or credits) by the plaintiff.
(b) Freight ($105,801.68). The sealed unit operation involved freight on three kinds of shipments: (i) shipment of replacement units to distributors (prepaid by the plaintiff); (ii) shipment of such units by distributors to dealers (prepaid in the first instance by the distributor or branch but charged by the latter to the plaintiff); (iii) shipment of inoperative units by dealers to the plaintiff’s repair shops (shipped collect).
(c) Unit Re-operation (less Compressor), $567,887.87 ; Compressor Re-operation, $378,558.89; and- Tools and Eguipment $17,081.51. The major categories of expense incurred by the plaintiff in reoperating sealed units at its repair shops consisted of the following: (i) labor charges consisting of the wages paid by the plaintiff, according to time cards, to the full-time employees of the shops, including ordinary workmen, foremen, clerical workers, material handlers, and inspectors; (ii) payroll taxes and fringe benefits (including hospitalization insurance, vacation allowances, etc.) for the foregoing employees; (iii) an allocated portion of the expenses of the office of the superintendent of the Moraine City plant (the only employees who did not work full-time in the sealed unit operation and whose expenses were charged to that operation), based upon the labor recorded by the Moraine City repair shop personnel as compared to the total labor recorded in the other operations supervised by that superintendent; (iv) material (spare parts, etc.) built into units in the process of reoperation; (v) supplies used in the repair shops (such as small tools, clerical forms, oil, rags, etc.); (vi) special light tools and equipment (such as pressure gauges, “black light” equipment for testing for leaks, etc.) which were used only in the repair shops and were not fixed *912 capital (i. e., depreciable) assets; (vii) power, light, and heat charges based on actual meter readings at the zone shops and on an allocation according to “demand usage” or square feet of space used at Moraine City; (viii) depreciation of fixed assets including machinery and that portion of the Moraine City plant occupied by the repair shop; (ix) rent of the spaces occupied by the zone shops; (x) maintenance charges on plant and equipment; (xi) state and local taxes and insurance on repair operation inventories.
(d) 17nits Scrapped ($5,583.61). Although all units in the “bank” described in finding 45 were carried at manufacturing cost in a continuing inventory account and thus were not charged as an expense of the sealed unit operation so long as they remained in an operating condition, from time to time inspection of an inoperative unit indicated that the unit was beyond repair, and the manufacturing cost of such a unit was then charged off as an expense.
The cost of replacement units sold by the plaintiff to its distributors (or its branches acting as distributors) for inclusion in the distributor’s inventory or bank of available units for replacing those which developed defects in the hands of individual purchasers of the plaintiff’s products during a warranty period, were accounted for by the plaintiff as part of the manufacturer’s costs of sales, and not as a part of the expense of fulfilling its obligations under the Protection Plan. All employees of the plaintiff’s sealed unit and compressor reoperating plants at Dayton and Moraine City, Ohio, were carried on the payroll of the operations at such plants.
(e) Commercial Expense ($100,003.74). Also charged to the sealed unit repair-and-replacement operation were the clerical and other expenses of handling and storing units and spare parts between the plaintiff’s manufacturing plant, the repair shops, and its distributors, of billing and crediting distributors and dealers, of maintaining statistical records, and of handling the general accounting activities necessarily involved in the cyclical operation.
(f) Experimental Expense ($1,35)30). To this account the plaintiff charged only the expenses incurred by the reg *913 ular full-time employees of the repair shops in developing improvements in repair techniques.
(g) Obsolete and Unsalable Stoch Scrapped ($4,663.93). Particular sealed unit models and parts therefor were manufactured by the plaintiff simultaneously with the products they would later be used to repair (see finding 45), and the plaintiff’s estimates of the quantities required occasionally turned out to he too high in the light of subsequent developments. In such cases the obsolete units and parts were scrapped and charged as an expense of the sealed unit operation, as were the costs of units and parts which were rendered unfit for use by physical deterioration or damage.
(h) Miscellaneous ($13,961.01). The plaintiff charged to a “miscellaneous” account a variety of items such as the cost of shipping compressors from zone shops to Moraine City and back (see finding 53), the cost of making certain special repairs which could not be performed in the regular repair shops and therefore had to be done elsewhere, and the cost of converting particular sealed units into another kind of unit mechanism where available stocks of the latter were low.
57. The following expenses were not charged by the plaintiff to the sealed unit operation and do not enter in any way into the computation of the tax recovery sought by the plaintiff in this case: (i) supervisory administrative expense above the level of plant superintendent (see finding 56 (c) (iii)); (ii) general accounting expense such as the accounting for and clerical handling of payrolls, accounts payable, etc.; (iii) specialized service expense such as the cost of services rendered to the sealed unit operation by the plaintiff’s sales, advertising, central office, public relations, patent, engineering, and design personnel.
58. All entries made on the plaintiff’s accounting ledgers as described in finding 56 were made in accordance with the accounting principles and practices in use throughout the General Motors Corporation, and there is no evidence that the allocation methods used were designed, or used, for any purpose other than the accurate reflection of the costs of the sealed unit operation.
*914 59. The plaintiff’s repair shops kept monthly records of the number of inoperative sealed units received, and they segregated the accounts according to the type of product and the warranty classification; monthly returns rendered by the repair shops gave the plaintiff an accurate count of (for example) the number of inoperative sealed units returned each month from 1942 model refrigerators under the One-Year Warranty, the number of such units returned from 1942 model refrigerators as to which the Protection Plan was still in effect, and the number of such units returned from 1942 model refrigerators as to which neither of the foregoing repair contracts was then in effect.
60. The returns furnished by the repair shops and similar reports supplied directly by distributors (see finding 49) furnished the basis upon which the plaintiff paid out the cash payments or “allowances” described in finding 56 (a). Thus the expense incurred by the plaintiff as “allowances” for the handling of units (both sealed and reciprocating) covered by the Protection Plan was determined by reference to the actual physical units involved.
61. The plaintiff found from its experience that although the expense of processing sealed units through the repair- and-replacement cycle (including shipment, physical repair, storage, etc.) might vary greatly as between any two particular units, over a period of time there was no significant difference between the average costs of processing (i) units which at the time of their repair were covered by the One-Year Warranty, (ii) units which at the time of their repair were covered by the Protection Plan, and (iii) units which at the time of their repair were “out-of-warranty” and not covered by either of the foregoing contracts.
62. Eelying upon the determination described in finding 61, the plaintiff computed the expense (other than “allowances” — see finding 60) attributable to the fulfillment of its obligations under the Protection Plan during a given period by allocating as Protection Plan expense that portion of the total repair-and-replacement expense for the same period (as described in finding 56) which bore the same proportion to the total expense as the number of sealed units returned under the Protection Plan bore to the total number of sealed *915 units returned to repair shops during the period involved. Thus (to use a hypothetical example) if 500 sealed units, of which 100 were from 1942 model refrigerators covered by the Protection Plan, were returned to the plaintiff’s repair shops in December, 1945, and if the total expense (other than cash “allowances”) of the repair-and-replacement operation for the same month was $5,000 (as described in finding 56), the plaintiff would record $1,000 (plus cash “allowances”) upon its books as the December, 1945, expense of fulfilling its obligations under the Protection Plan with respect to 1942 model refrigerators.
63. As set out in finding 55, the total expenses shown by the plaintiff’s books as representing its costs of fulfilling its obligation under Protection Plans sold during the period January 1, 1942, through December 31, 1944, were $1,432,-081.49. The manner in which the plaintiff ascertained these expenses as attributable to the fulfillment of its obligations under the Protection Plans resulted in a fair and reasonable determination of such expenses.
64. All of the expenditures entering into the amount of $1,432,081.49 stated in finding 63 were made within the period January 1, 1942, through December 31, 1948, as follows:
1942_ $15, 766.79
1943_ 123, 820. 99
1944_ 466, 079. 77
1945_ 361, 685.57
1946_ 210, 076.29
1947_ 181,458.39
1948_ 73,193.69
1,432,081. 49
Expenditures were also made in 1949 but they were small and have been omitted by the plaintiff from its claim in this case.
65.All of the expenses incurred by the plaintiff in performing its agreement under the Protection Plan were charged to a special account, “Protection Plan — Warranty Reserve.” No expenses were charged to this account other than those classified by the plaintiff as allocable to its fulfilling of the Protection Plan. All of the amounts collected by the plaintiff for Protection Plans were credited to the special account called “Protection Plan — Warranty Reserve.” Protection Plan collections were the only amounts *916 credited at any time to this account. Within this account both collections and expenses were segregated in accordance with the product line and model year (e. g., 1942 model refrigerators) to which they were applicable.
66. The “Protection Plan — Warranty Eeserve Account” is segregated by model lines. This account is reviewed by the plaintiff frequently. At the end of a given period, when it is felt that all obligations under the Protection Plans involved are completed, any debit or credit balances remaining in the account are closed out to an account designated “Miscellaneous Income Account” which is a type of profit and loss account.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, together with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.